**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 22-CR-173 (RCC)** |
| | ) | |
| | ) | |
| **JOSEPH ARNOLD,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## **GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case. On July 19, 2022, the defendant pled guilty to one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2). For the reasons set forth below, the government recommends a sentence of 151 months of incarceration, followed by ten years of supervised release.

## **BACKGROUND**

As set forth in the Statement of Offense, in October 2020, the defendant communicated with an undercover FBI agent based in Dallas, Texas on the KIK messaging application. The defendant sent the undercover FBI agent images and videos depicting child pornography and communicated a sexual interest in children. The defendant informed the undercover FBI agent that he resided in the Washington, D.C. area. The Dallas FBI agent provided the defendant with the KIK name of an undercover law enforcement agent (UC) located in Washington, D.C., and informed the defendant that the UC was the father of an underage girl.

On October 26, 2020, the defendant initiated a private KIK conversation with the D.C.-based UC. During the course of the conversation, the defendant stated that he had a 2-year-old son but wished he had a daughter. The defendant sent the UC an image of himself holding his clothed son on his shoulders. The defendant informed the UC that he "was always hoping to find someone close to [him] with the same interests." The UC informed the defendant that he is separated with shared custody of his 8-year-old daughter, and that he was sexually active with his daughter.

The defendant informed the UC that he had a sexual interest in females ages 8 and up and that he possessed many videos of child sexual abuse material. The defendant then sent the following videos/images to the UC on October 26, 2020:

1. An image of a prepubescent child sitting on a bed fully nude. The child's legs are crossed and her bare vagina is visible.

2. A video of a prepubescent girl sitting on the floor fully nude. The child is touching her vagina with her fingers and a blue sex toy.

3. A video of a prepubescent female child. The child is sitting fully nude on a bathroom floor. The child is exposing and touching her bare vagina. The child exposes her bare anus to the camera.

4. A video depicting a prepubescent child wearing shorts and a pink shirt. The child is standing and appears to be typing on computer keyboard. The child pulls down her pants and exposes her bare vagina.

After sending the above listed videos, the defendant stated, "I got hundreds more." During the course of the chat, the defendant sent the UC an additional video. The video depicts an adult female digitally penetrating two prepubescent females' vaginas. The video also depicts a

prepubescent girl sucking the penis of a prepubescent boy and a prepubescent female licking the vagina of a prepubescent female.

During the course of the chat, the defendant asked the UC what he had done with his daughter. The following is a portion of that chat:

**UC**: So she sucks my dick, jerks me off, I have pressed head in her pussy but not really deep and I eat and finger her.

**Defendan**t:  That's awesome. I want so badly to eat a little girl out ☺

UC: I think it would be fucking hot to see another guy eat her little pussy

**Defendant**: That sounds amazing ☺

UC: I am open to it if you are

**Defendant**: Oh yeah I would be

UC: I have her next week if that works (the UC then sends two non-explicit images of his purported daughter)

**Defendant**: Yeah I'm up every tue wed and thurs ☺ So sexy

…

**Defendant**: I bet your girl is tasty ☺ Huge turn on."

Later in the chat, the defendant sent the following additional child pornography videos and images to the UC:

1. A video of a prepubescent child engaged in sexual intercourse with a prepubescent male. The child is being directed on what to do by an unknown adult female that can be heard in the background.

2. A video depicting an adult female masturbating an adult penis in the mouth of what appears to be a young teen girl.

3. A video of a toddler girl with her mouth on the penis of an adult male

4. An image of a prepubescent child with her legs spread exposing her bare vagina and anus.

5. A video of a prepubescent child with her mouth on an adult male penis. The child can be seen gagging and vomiting during this video.

6. A video of two prepubescent females being vaginally penetrated by an adult male penis.

On October 27, 2020, the defendant agreed to meet the UC and his purported daughter in Washington, D.C. on Thursday, November 5, 2020. On November 3, 2020, the defendant continued to discuss the planned November 5 meeting with the UC. The following is a portion of that communication:

**Defendant**: Wonder if I should change my hotel one night to the DC area instead of Crystal City.

UC: It's up to you, 15 min not to bad at all as far as a drive. Damn I'm getting excited for this. Besides licking her pussy anything else you have in mind with her.

**Defendant**: I'm open to anything really lol. Based on yours and her comforts.

UC: Sweet I'm open to you doing other stuff with her my only limits is deep penetration but everything else I'm open to.

**Defendant**: Totally fine with that ☺ Huge turn on thinking of her ☺

4

UC: Sweet, I know can't wait ☺

**Defendant**: Me either. Is it wrong that I'm this excited that a fantasy will be a reality?

UC: I'm excited to, really want to see her with another perv. Very turned on by that.

**Defendant**: We are pretty pervy huh

UC: Yes!!

**Defendant**: Can't wait to taste her ☺

UC: Can't wait to see your mouth on her lil pussy

**Defendant**: That's hot Inwamt [sic] to feel hew squirm. Feel her. Fat fingers on phone lol

UC: Mmmm yes she is really tight too, Ill lotionslube etc

**Defendant**: I'd love to see more of her wed night too ☺

On November 5, 2020, the defendant traveled to Washington, D.C. to meet with the UC. Upon his arrival at the pre-arranged meeting location, law enforcement arrested the defendant.

## DISCUSSION AND RECOMMENDATION

### I.      Generally Applicable Legal Principles

In *United States v. Booker*, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. § 3553(b)(1). *Booker*, 125 S. Ct. at 756.

5

In post-*Booker* cases, the Supreme Court has stated that a district court should begin all sentencing proceedings by correctly calculating the applicable guidelines range. *See United States v. Gall*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). After giving both parties an opportunity to argue for an appropriate sentence, the district court should then consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id.* These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (18 U.S.C. § 3553(a)(2)); the kinds of sentences available (18 U.S.C. § 3553(a)(3)); the Sentencing Guidelines and related Sentencing Commission policy statements (18 U.S.C. § 3553(a)(4) and (a)(5)); the need to avoid unwarranted sentencing disparities (18 U.S.C. § 3553(a)(6)); and the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

## II. The U.S. Sentencing Commission's 2012 and 2021 Reports on Child Pornography Offenses

In 2012 and 2021, the U.S. Sentencing Commission published reports to Congress analyzing federal sentences in both production and non-production child pornography offenses. The reports recommend three categories of aggravating factors that courts should consider when imposing sentences in non-production cases: content, community, and conduct. The Commission further explained how these factors should affect a defendant's sentence:

> The presence of aggravating factors from any of these three categories, even without the presence of any aggravating factors from the other two categories,

warrants enhanced punishment depending on the degree that aggravating factors from that category are present in a particular case. The presence of aggravating factors from multiple categories generally would warrant a more severe penalty than the presence of aggravating factors from a single category.

U.S. Sent'g Comm'n, Report to Congress: Federal Child Pornography Offenses (2012) at 321 (hereinafter 2012 Report). The three categories of aggravating factors were first enumerated in the 2012 Report, and subsequently reaffirmed by the Commission in the 2021 Report.

*Content*

As outlined in both the 2012 and 2021 Report, this factor directs courts to evaluate the content of an offender's collection and behavior "in terms of volume, the types of sexual conduct depicted in the images, the ages of the victims depicted, and the extent to which an offender has organized, maintained, and protected his collection over time, including through the use of sophisticated technology." 2012 Report at 320.

*Community*

This factor directs the Court to evaluate "the degree of an offender's engagement with other offenders — in particular, in an Internet 'community' devoted to child pornography and child sexual exploitation." 2012 Report at 320. The Commission distinguishes between impersonal file-sharing exchanges, which involve "anonymous, indiscriminate" open exchange and no two-way communication, versus "personal" distribution in closed groups, involving two-way communication concerning child pornography and child exploitation. *Id.* at 313-14, 324.

*Conduct*

The third factor asks courts to assess whether an offender "has a history of engaging in sexually abusive, exploitative, or predatory conduct in addition to his child pornography offense." 2012 Report at 320. Notably, the Commission recommends that, in addition to criminal offenses,

courts consider "non-criminal acts of sexually deviant behavior" because such behavior also indicates sexual dangerousness. *Id.* at 325.

## III.   **Government's Sentencing Recommendation**

### A.   Sentencing Guidelines Calculation

The parties' plea agreement mistakenly states that the offense involved only 10-150 images of child sexual abuse material, and thus incorrectly calculates the defendant's adjusted offense level as 34 and his final offense level, after a presumed three-point decrease for acceptance of responsibility, as 31. As a result, the plea agreement erroneously calculates the defendant's Guidelines range as 108-135 months.

However, as the Presentence Report correctly notes, the Statement of Offense establishes that the offense in fact involved over 600 images of child sexual abuse material, bringing the defendant's adjusted offense level to 37. Assuming three points are awarded for acceptance of responsibility, the defendant's final offense level is 34 and his accurate Guidelines range is 151-188 months of incarceration.

### B.   Acceptance of Responsibility

Section 3E1.1 of the Sentencing Guidelines provides that a defendant's offense level should be decreased by two points if he "clearly demonstrates acceptance of responsibility for his offense." The burden is on the defendant to establish acceptance of responsibility. *United States v. McLean*, 951 F.2d 1300, 1302 (D.C. Cir. 1991). When determining eligibility for an adjustment under § 3E1.1, a district court may require the defendant "to provide a candid and full unraveling of the circumstances surrounding the offense of conviction," *In re Sealed Case,* 350 F.3d 113, 123 (D.C. Cir. 2003) (internal quotation marks omitted), and may consider whether the defendant truthfully admitted, or instead falsely denied or frivolously contested, any "additional relevant

conduct for which the defendant is accountable." *United States v. Saani*, 650 F.3d 761, 767 (D.C. Cir. 2011); *see also* U.S.S.G. § 3E1.1 cmt n.1 ("A defendant who falsely denies ... relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility"). Thus, the sentencing court may "require an acceptance of responsibility that extend[s] beyond the narrow elements of the offense to all of the circumstances surrounding the defendant's offense." *United States v. Levya*, 916 F.3d 14, 28 (D.C. Cir. 2017) (upholding trial court's finding that defendant did not accept responsibility when he falsely minimized his role in conspiracy) (internal citations omitted).

Here, the defendant's post-plea statements to the psychosexual evaluator show that he has not accepted responsibility for his conduct. The defendant disclaimed any sexual interest in children and instead portrayed *all* of his conduct – his participation in the KIK group, his distribution of child pornography, and his travel to D.C. to meet the UC's purported daughter – as an attempt to 'trap' other offenders. *See* Psychosexual Report at 11. Specifically, the defendant claimed that a parolee informed him that sex offenders often use KIK to exchange child sexual abuse material (CSAM) and, in response, the defendant downloaded the KIK app and joined a group that shared CSAM in order to "expose" these offenders. *Id.* The defendant further claimed that his chats with the UC were nothing but an attempt to "get [the UC] to give me information" and that the defendant was in fact creating a "honeypot" to lure in cybercriminals. *Id.*

The defendant's statements are patently false. As an initial matter, the defendant made no effort to 'expose' either the KIK groups or the two UCs with whom he was communicating. The Texas UC gave the defendant his phone number. The District of Columbia UC gave the defendant both his phone number *and* his address. At no point did the defendant provide this information to law enforcement. Instead, the defendant drove to D.C. to meet the UC and the UC's purported

eight-year-old daughter, bringing with him an external drive containing hundreds of videos of CSAM. Contrary to the defendant's statements that he never downloaded CSAM and that he only "said" he would bring a drive for the UC but "never made one for him," *see* Psychosexual Report at 11, law enforcement recovered an external hard drive from the defendant's vehicle which contained hundreds of files of CSAM with names such as "3yo Girl Held In Mom's Lap While 9yo Son and Father Fuck Her"; "12yo cute girl fucking with dad"; and "Preteen Daughter Sucking Hard." The CSAM files are categorized into the following subfolders:

- Boy Boy
- Boy Girl
- Dad Daughter
- Family
- Girl Girl
- Girl Solo
- Images
- Mom Daughter
- Mom Son
- Other

The 'Dad Daughter' subfolder, for example, has 1,034 videos. The government is attaching the forensic examiner's report noting the presence of CSAM files on the hard drive as Exhibit 1 (under seal); in addition, the government requests that the Court view the files from the hard drive and will make them available to the Court at the Court's convenience.[1]

Moreover, the defendant's account is contradicted by the hundreds of text messages that he exchanged with both the UC in Texas and the UC in the District of Columbia. The sheer volume of the messages, as well as their content, do not show the defendant attempting to 'lure' the undercover officers or 'get information' from them. To the contrary, the messages unmistakably

---

[1] Defense counsel previously reviewed these files at the U.S. Attorney's Office on February 22, 2022.

show the defendant's interest in the sexual abuse of children, as well as the lengths to which he was willing to go in order to sexually assault a child. These messages are attached as Exhibits 2-6 (under seal).[2] In them, the defendant repeatedly tells both undercover officers how 'lucky' they are to have a biological daughter that they can abuse, and discusses his own interest in sexually abusing the D.C. officer's purported child, stating, for example, that he wants to "eat her out while fingering her :)," that she will be "yummy to lick," and that he "can't wait to taste her." Notably, when the D.C. undercover officer tells the defendant that his daughter will be arriving shortly for the weekend, the defendant encourages the UC to sexually abuse the child, asking the UC if he is "getting some tonight," referring to the child as "dessert," telling the UC to "let me know if you get a taste tonight," and stating "if you do some licking tonight I'm not opposed to more pics." *See* Exh. 5 at 59—80. The defendant offers no explanation as to why he would encourage an individual – whom he believed was actively abusing his daughter – to further abuse that child if the defendant was merely trying to 'trap' the UC. Nor does the defendant attempt to explain why he would send a photo of his own minor son to a man whom he believed was a child predator as part of that 'trap.'

In short, the defendant proffers a false narrative about his conduct in an effort to cast his actions in a positive light and evade culpability for his behavior. He lied to the psychosexual evaluator and, by extension, this Court, about the very nature of his conduct. Consequently, the defendant has not shown "a recognition and affirmative acceptance of personal responsibility for

---

[2] Exhibits 2 and 3 are the KIK conversations between the defendant and the UC in Texas. Exhibits 4 and 5 are the KIK conversations between the defendant and the UC in D.C. Exhibit 6 is the text messages between the defendant and the UC in D.C. The user names of the undercover officers have been redacted.

his criminal conduct." *See Maclean*, 951 F.2d at 1302. Accordingly, he should not be awarded a two-level decrease for acceptance of responsibility.

      C.    <u>Government's Recommendation</u>

The government concurs with the U.S. Probation Office's recommendation of 151 months of incarceration. Given the government's error in the original plea calculation, the government will not argue for a different adjusted offense level nor corresponding sentencing range. However, as noted *supra*, the government's position is that the defendant should not be awarded a two-level decrease for adjustment of responsibility given his demonstrated lies and his post-plea denial of culpability regarding the crux of his conduct. A sentence of 151 months of incarceration is consistent with the government's original sentencing calculation without the two-point decrease.[3] Furthermore, this sentence is consistent with the 3553(a) factors, as discussed further below.

In addition, the government recommends a 10-year period of supervised release. This extended period of supervised release is necessary given the defendant's continued failure to accept responsibility and his misleading statements to the psychosexual evaluator, both of which demonstrate the ongoing danger he presents to the community.

**IV.    The § 3553(a) Factors Support a Sentence of 151 Months of Incarceration Followed By Ten Years of Supervised Release.**

      A.    <u>Nature and Circumstances of the Offense</u>

The defendant's conduct is particularly egregious. He distributed nine videos (and additional images) of prepubescent children being sexually exploited and raped to an undercover

---

[3] The government notes that per the plea agreement, both parties reserved the right to allocute for a sentence within the Guidelines range as ultimately determined by the Court, even if the Guidelines range ultimately determined by the Court is different from the Estimated Guidelines range calculated by the parties in the plea agreement. *See* Plea Agreement ¶ 6 (ECF 39).

officer, boasting about having "hundreds more" such videos and images. The children captured in the videos which the defendant bragged about possessing were traumatized and victimized in the worst way imaginable at the time the images were created, and they are re-victimized and re-traumatized each and every time an individual, like the defendant, views or shares the images for his own sexual gratification. This harm is not theoretical; the victim impact statements submitted in this case, from the actual children depicted in the material possessed by the defendant, describe this ongoing pain.

Moreover, not only did the defendant distribute graphic videos of child pornography, but he traveled to the District of Columbia in order to sexually abuse an eight-year-old child. As noted above, the defendant communicated his interest in sexually abusing a child to two undercover officers, repeatedly stating how jealous he was of their access to their biological daughters and encouraging their ongoing sexual abuse. He messaged both undercover officers about how excited he was to sexually abuse the D.C. undercover officer's eight-year-old daughter, frequently describing how he imagined putting his mouth on her vagina and how she would 'taste.' There is no credible argument that these comments were merely fantasy, given that the defendant in fact traveled from Virginia to the District of Columbia to meet the undercover officer at the agreed-upon time and place, bringing with him a hard drive full of child sexual abuse material to share. In short, the defendant's actions were not confined to simply watching others sexually exploit and rape children; instead, he attempted to sexually abuse a child himself.

The government notes that the defendant's conduct demonstrates all of the aggravating factors outlined by the U.S. Sentencing Commission in its 2012 and 2021 reports. First, with respect to content, the defendant possessed hundreds of videos and images of child sexual abuse material and, as demonstrated in Exhibits 2--6, repeatedly boasted to the UCs about the ways he

managed expand and hide his collection, stating, for example, that "on my laptop I use a virtual pc with it attached to a thumb drive and VPN for this stuff" and that he planned to "make a server…set up like a web server and image gallery so we can upload and sort." *See* Exh. 2 at 13; Exh. 5 at 8-10. Nor did the defendant intend to keep this material for himself, but instead put hundreds of videos on a hard drive to share with the D.C. undercover officer. Second, the defendant engaged with multiple individuals on KIK regarding child sexual abuse material and the sexual abuse of children. Far from being a passive participant, he sent child sexual abuse material to at least two other members and even created new accounts when KIK terminated his prior accounts for policy violations. And third, as discussed above, the defendant's conduct was not limited to merely trafficking in child pornography. Instead, he took concrete steps to sexually abuse an eight-year-old child. Such conduct is certainly "sexually deviant behavior" that "indicates sexual dangerousness" within the meaning of the Sentencing Commission's reports.

In short, the conduct that brings the defendant before the Court was not a one-time occurrence, nor was it limited to trafficking in child sexual abuse material. The defendant distributed multiple videos of children being raped, possessed hundreds of other videos of child pornography, and attempted to find a child that he could sexually abuse himself. Given the egregious nature of the defendant's criminal conduct and, notably, the presence of <u>all</u> of the aggravating factors recognized by the Sentencing Commission, a sentence of 151 months of incarceration is appropriate.

B.     <u>History and Characteristics of the Defendant</u>

The defendant does not have a criminal history. However, his lack of a prior record is not an accurate reflection of his history and character. As noted above, the defendant amassed a significant collection of child pornography and communicated at length with two undercover

officers regarding his desire to sexually abuse a child. His history as a prior member of the military and his active governmental security clearance render his actions even more egregious. Indeed, the defendant exploited his knowledge and expertise in computer security to engage in the offense behavior, boasting to the undercover officers about his computer skills and how he used them to both hide his online behavior and to build a computer system that would hold an addable, shareable gallery of categorized child pornography. *See, e.g.,* Exh. 2 at 13; Exh. 3 at 13-15, 30-34; Exh. 5 at 8-10.

The government acknowledges the defendant's claim of a tumultuous upbringing and his characterization of himself as a victim of sexual abuse. However, none of this history explains or justifies why, once the defendant was an adult, he chose to traffic in child pornography or sexually abuse an eight-year-old child. Indeed, unlike many defendants who come before this Court, the defendant had a well-paying job, a family, and a small child. Despite these advantages, however, the defendant chose to victimize children. In short, there is nothing about the defendant's history or characteristics that would justify a shorter period of incarceration than that requested by the government and the U.S. Probation Office.

C.    Seriousness of the Offense, Promotion of Respect for the Law, and Just Punishment for the Offense

Child pornography offenses are extremely serious because they result in perpetual harm to the most vulnerable victims, while simultaneously validating and normalizing the sexual exploitation of children. Courts across the country have recognized this:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.

> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However,

once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of the defendants, sorry that their actions were discovered by law enforcement.

*United States v. Cunningham*, 680 F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012).[4]

When enacting mandatory minimum penalties for those who produce and traffic in the sexual abuse and exploitation of children, Congress similarly described the evil of child pornography:

[W]here children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years . . . [The] existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children . . . it inflames the desires of . . . pedophiles . . . who prey on children, thereby increasing the creation of and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials.

Child Pornography Prevention Act of 1996, Pub.L. No. 104-208, § 121, 110 Stat. 3009, 3009-27 (1996).

There is perhaps no greater invasion of privacy than that caused by the dissemination of child pornography. With a click of the button on a camera, the sexual abuse of these children is memorialized forever. It is terrible enough that a child must live with the memory of his or her

---

[4] *See also In re Amy Unknown*, 636 F.3d 190, 201 n.12 (5th Cir. 2011) (*citing United States v. Norris*, 159 F.3d 926 (5th Cir. 1998) (describing how the distribution of child pornography creates a marketplace for images of children, perpetuating abuse); *United States v. Yuknavich*, 419 F.3d 1302, 1310 (11th Cir. 2005); *United States v. Grosenheider*, 200 F.3d 321, 332-34 (5th Cir. 2000).

initial abuse. It is hard to even comprehend how that child could then learn to cope with the fact that strangers everywhere are using the worst moments of that child's life to sexually gratify themselves and that he or she can do nothing to stop them from continuing to do so. The only recourse that these children have is the strong enforcement of the laws that hold these offenders accountable for the tremendous damage they have inflicted upon countless child victims.

Traffickers of child pornography, like the defendant, create a market and demand for materials depicting the sexual abuse and exploitation of real children. They contribute to the cycle of abuse and are in part responsible for the harm suffered by the children used to produce the materials in their collections. *See United States v. Goff*, 501 F.3d 250, 259-260 (3d Cir. 2007) ("Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography"). In *United States v. Goldberg,* the Seventh Circuit stated:

> The district judge was influenced by the erroneous belief that a sentence affects only the life of the criminal and not the lives of his victims. Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded-both consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. [Citations omitted].

491 F.3d 668, 672 (7th Cir. 2007). In other words, even if consumers of child pornography do not themselves molest children, their actions directly contribute to the abuse of children.

Here, the defendant made the conscious decision to share multiple videos of children being exploited and raped, while downloading hundreds of other videos. A sentence of 151 months of incarceration is necessary to promote respect for the law, ensure just punishment, and to reflect the seriousness of the defendant's offenses.

D.      Adequate Deterrence and Protection of the Public

The possession and trafficking of child pornography endangers the public by encouraging the rape, violence, and abuse of children. In *United States v. Miller*, the Fifth Circuit stated:

> [R]eal children are being abused and violated when pornographic images are made. Without a market for such images, and without a strong appetite for more and more images exhibited by [defendant] and similarly situated defendants, there would be far fewer children who are injured and criminally assaulted in this way.  If a handful of pornographic images taken twenty years ago were sufficient to satisfy the perverse desires of those who possess and traffic in child pornography, we would not have the huge industry that exists internationally today.

665 F.3d 114, 123 (5th Cir. 2011). The importance of deterrence with respect to child pornography offenses is well-established. Serious penalties for child pornography offenders decrease the number of participants in the market, which in turn decreases the need for its production:

> The greater the customer demand for child pornography, the more that will be produced.  Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

*Goldberg*, 491 F.3d at 672; *see also Osbourne v. Ohio*, 495 U.S. 102, 109-10 (1990) ("It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand"); *Goff*, 501 F.3d at 261 ("Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing."); *United States v. Barevich*, 445 F.3d 956, 959 (7th Cir. 2006) ("Transporting and receiving child pornography increases market demand. The greater concern under the Guidelines is for the welfare of these exploited children. The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it.").

18

In this case, there are serious indications that the defendant's harmful conduct will continue in the future. Not only did the defendant attempt to sexually abuse a child, but he continues to deny responsibility for his behavior, instead seeking to portray himself as a kind of vigilante protecting the community. His attempt to manipulate the psychosexual evaluator and the Court, even after pleading guilty, demonstrates both his dangerousness and the need for a lengthy period of supervised release.

Moreover, the defendant's sentence should be sufficient to deter not only the defendant from reoffending in the future, but also to deter the criminal conduct of others who engage in, or contemplate engaging in, the trafficking of child sexual abuse material. As stated in *Goldberg*, "[s]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for trafficking in child pornography, the greater the customer demand for it and so the more will be produced." 491 F.3d at 672. *See also Goff*, 501 F.3d at 261 (stating in a child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing"). The government's recommended sentence of 151 months of incarceration adequately serves this purpose.

E.     Kinds of Sentences Available and the Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) requires courts to consider the need to avoid unwarranted sentencing disparities among defendants "with similar records who have been found guilty of similar conduct." However, it "does not require the district court to avoid sentencing disparities between [ ] defendants who might not be similarly situated." *United States v. Mattea*, 895 F.3d

762, 768 (D.C. Cir. 2018) (quoting *United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010). Here, the U.S. Sentencing Commission's Judicial Sentencing Information shows that the average sentence length for individuals sentenced under U.S.S.G. § 2G2.2, with a final offense level of 34, was 104 months during Fiscal Years 2017—2021. In the present case, however, the defendant did far more than simply distribute or receive child pornography. His attempt to engage in the hands-on sexual abuse of a child, and his subsequent travel to D.C. to do so, places him in a vastly different category than most individuals sentenced under this provision. The defendant did not receive any "points" or enhancements under the Guidelines for this conduct, despite its even more severe nature than the offenses addressed under Section 2G2.2. In other words, the defendant engaged in even worse conduct than what Section 2G2.2 encompasses. Accordingly, there is no unwarranted disparity presented by the government's recommendation.

    F.    The Victims Are Entitled to Restitution

    In child pornography cases, restitution is mandatory to any person "harmed as a result of" a defendant's crime. *See* 18 U.S.C. § 2259(a), (c); *see also United States v. Monzel*, 930 F.3d 470, 476 (D.C. Cir. 2019); *United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015) ("Pursuant to 18 U.S.C. § 2259, the victims of certain federal crimes, including possession of child pornography, are entitled to mandatory restitution."). Restitution includes "the full amount of the victim's losses," which may include any costs incurred by the victim for:

    (A) Medical services relating to physical, psychiatric, or psychological care;

    (B) Physical and occupational therapy or rehabilitation;

    (C) Necessary transportation, temporary housing, and child care expenses;

    (D) Lost income;

    (E) Attorneys' fees, as well as other costs incurred; and

(F) Any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(a), (b)(3); *see also United States v. Hite*, 113 F. Supp. 3d 91, 94 (D.D.C. 2015).

Distribution of Child Pornography is a child pornography trafficking offense, as defined in 18 U.S.C. § 2259(c)(3). Therefore, the Court shall determine the full amount of the victim's losses and shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is not less than $3,000. 18 U.S.C. § 2259(b)(2). Here the government has received restitution requests from the attorneys of nine identified victims. The Government has attached a proposed Restitution Order to this Memorandum as Attachment A, reflecting the amounts of restitution requested by the attorneys for these victims. The supporting documents received by the government for each restitution request are also filed with the Court under seal.

In *Paroline v. United States*, 134 S. Ct. 1740 (2014), the United States Supreme Court faced a circuit split over the interpretation of 18 U.S.C. § 2259, specifically over "how to determine the amount of restitution a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed." *Paroline*, 134 S. Ct. at 1716. In *Paroline*, the defendant possessed two images of the victim who was seeking restitution. The Court's answer to this question involved three steps.

First, *Paroline* held that, because the statute defined a "victim" as someone "harmed as a result" of the offense, restitution under § 2259 was proper "only to the extent the defendant's offense proximately caused a victim's losses." *Id*. at 1722.

Second, the Court held that "proximate cause" under § 2259 did not require strict but-for causation. *Id*. at 1726-27. The Court recognized that in most child pornography possession cases, a victim's losses resulted from harm caused by the trafficking of his or her images by numerous

"geographically and temporally distant offenders acting independently, and with whom the defendant had no contact." *Id.* at 1727. As a result, the Court held that:

> In this special context, where it can be shown that a defendant possessed a victim's images and that a victim had outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant by recourse to a more traditional causal inquiry, a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses.

*Id*. at 1725. The Court made clear that, where the victim's losses are "the product of the acts of thousands of offenders," a restitution order should not be "too severe" but must not be merely "a token or nominal amount." *Id.* That is, in part, because a restitution order under § 2259 serves "twin goals," the first being to "help[] the victim achieve eventual restitution for all her child-pornography losses" and second to "impress[] upon offenders the fact that child pornography crimes, even simple possession, affect real victims." *Id.*

Third, the Court provided sentencing courts with the guidance regarding how to determine the proper amount of restitution under this standard. The Court noted that a sentencing court's goal should be to assess "the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses," taking into account any "available evidence." *Id*. at 1727-28. The Court emphasized that there is no "precise mathematical inquiry" governing this determination and that district courts must exercise "discretion and sound judgment" in fashioning restitution awards. *Id*. at 1728. The Court suggested several factors to be considered, including: (1) the number of defendants convicted of possessing the victim's images; (2) the number of future offenders likely to be caught and convicted; (3) whether the defendant had any role in the initial production of the images; (4) whether the defendant reproduced or distributed the images; (5) how many images the defendant possessed; and (6) "other facts relevant to the

defendant's relative causal role." *Id*. "These factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders. They should rather serve as rough guideposts for determining an amount that fits the offense." *Id*.

Congress has since amended Section 2259 to both codify *Paroline*'s basic approach and to set a restitution floor of $3,000. *See* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299, 132 Stat. 4383 (2018). As detailed in the victim impact statements and requests for restitution that were filed under seal with the Court, some of the victims depicted in the images and videos that the defendant downloaded and distributed are seeking restitution for costs associated with attending psychotherapy and/or counseling, medications, loss of income, and for various medical expenses incurred as a result of the defendant's actions. Thus, for the reasons set forth above, the government respectfully requests that the Court shape an appropriate restitution award consistent with those in the Proposed Restitution Order attached as Attachment A, to be paid by the defendant.

**CONCLUSION**

For the foregoing reasons, the government respectfully recommends that the defendant be sentenced to a term of incarceration of 151 months, followed by ten years of supervised release. Such a sentence contemplates not only the relevant guidelines range set forth for this offense, but also adequately reflects the factors as outlined in 18 U.S.C. Section 3553(a).

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

   */s/ Caroline Burrell*
Caroline Burrell
CA Bar No. 283687
Assistant United States Attorney
601 D. St N.W.
Washington, D.C. 20530
(202) 252-6950
caroline.burrell@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that the government's opposition was duly served upon the defense counsel by electronic means via ECF.

This 27th day of April, 2023.


_____*/s/ Caroline Burrell*
AUSA Caroline Burrell

# ATTACHMENT A
# PROPOSED RESTITUTION ORDER

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 22-CR-173 (RCC)** |
| | ) | |
| | ) | |
| **JOSEPH ARNOLD,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

Upon consideration of the United States' Sentencing Memorandum and Exhibits, IT IS
HEREBY ORDERED that the Government's Motion is GRANTED; and:

For the reasons stated on the record at sentencing on May 10, 2023, and as the record herein
fully supports, IT IS HEREBY ORDERED that the defendant, Joseph Arnold, shall pay restitution,
pursuant to 18 U.S.C. §§ 2259, 3663, 3663A, and 3664, for the benefit of the victims, in the amount
and to their Attorneys of Record, as detailed below. The total amount of restitution owed by the
defendant is $67,500.

1) $7500 to the victim depicted in the Best Necklace Series

Carol L. Hepburn
PO Box 17718
Seattle, WA 98127

*Payments should be made payable to "Carol L. Hepburn I/T/F Maria"

2) $10,000 to the victim depicted in the Marineland1 Series

Carol L. Hepburn
PO Box 17718
Seattle, WA 98127

*Payments should be made payable to "Carol L. Hepburn I/T/F Sarah"

3)      $10,000 to the victim depicted in the Vicky Series

    Carol L. Hepburn
    PO Box 17718
    Seattle, WA 98127

*Payments should be made payable to "Carol L. Hepburn I/T/F Lily"

4)      $10,000 to the victim depicted in the Lighthouse1 Series

    Deborah A. Bianco
    PO Box 6503
    Bellevue, WA 98008

*Payments should be made payable to "Deborah A. Bianco, in trust for Maureen"

5)      $5,000 to the victim depicted in the Aprilblonde Series

    Restore the Child, PLLC
    2522 N Proctor St., Ste. 85
    Tacoma, WA 98406

*Payments should be made payable to "Restore the Child in Trust for April"

6)      $5,000 to the victim depicted in the Bluepillow1 Series

    Deborah A. Bianco
    PO Box 6503
    Bellevue, WA 98008

*Payments should be made payable to "Deborah A. Bianco, in trust for Henley"

7)      $5,000 to the victim depicted in the 2crazygurls Series

    Restore the Child, PLLC
    2522 N Proctor St., Ste. 85
    Tacoma, WA 98406

*Payments should be made payable to "Restore the Child in Trust for Chelsea"

8)      $10,000 to the victim depicted in the Jenny Series

    Marsh Law Firm PLLC
    ATTN: Jenny
    PO Box 4668 #65135
    New York, NY 10163-4668

*Payments should be made payable to "Marsh Law Firm PLLC in Trust for Jenny"

9)    $5,000 to the victim in the Sweet White Sugar Series

      Deborah A. Bianco
      PO Box 6503
      Bellevue, WA 98008

 *Payments should be made payable to "Deborah A. Bianco, in trust for Pia"

     IT IS FURTHER ORDERED, that the following shall be ordered and the corresponding

language incorporated into the Judgment and Commitment order:

     The full sum or amount of ordered restitution is due and payable immediately. This restitution order constitutes an enforceable judgment, consistent with the terms of the Plea Agreement between the United States and the Defendant and pursuant to 18 U.S.C. § 2259, 18 U.S.C. § 3613 (a), (c) and (f) and § 3664 (m)(1)(A).  Any payments must be made to the parties at the addresses detailed above.  Any schedule of payments imposed by the Court is merely a minimum schedule of payments and will not be the only method, nor a limitation on the methods, available to the United States to enforce the criminal judgment, including without limitation by administrative offset. Consistent with 18 U.S.C. § 3664 (n), "if the [Defendant] receives substantial resources from any source…during a period of incarceration, he will be required to apply the value of such resources to any restitution still owed."

     **Imprisonment**.  During any period of incarceration in a prison in the United States, payment of any criminal monetary debt (special assessments and restitution) remains due, and the Defendant shall pay, at a minimum, the greater of $25 or 50% of the deposits in his inmate trust account per quarter. The defendant must participate in the Bureau of Prisons' Inmate Financial Responsibility Program while incarcerated.

     **After Imprisonment**.  Any portion of the criminal monetary debt that remains unpaid at the time of the defendant's release from imprisonment shall be paid at the monthly rate of at least $1000.00, plus 25% of gross monthly income in excess of $2,300.  The Court will further assess Defendant's ability to pay following his release from imprisonment.

     IT IS FURTHER ORDERED, that once paid, the Clerk's Office shall disburse monies

received in satisfaction of restitution to the victims as listed and detailed above.

IT IS FURTHER ORDERED, that consistent with the terms of the Plea Agreement, which was accepted by the Court, the restitution amount of $67,500, with the above-described provisions, is hereby incorporated into the Judgement and Commitment Order for this matter.

SO ORDERED, this _____ day of May 2023.

_____

THE HONORABLE JUDGE RUDOLPH CONTRERAS
UNITED STATES DISTRICT COURT JUDGE